Dear Mr. John Tobin,
You have asked for our opinion concerning the authority of the Maryland State Police Forensic Science Division ("Crime Lab") to include certain DNA samples in the statewide DNA data base. State law mandates that DNA samples be collected from certain categories of individuals. One category consists of individuals who have been convicted of certain qualifying offenses in the past and who remained incarcerated after October 1, 1999. With respect to that category, you ask:
(1) May the Crime Lab collect and maintain a DNA sample from an inmate who was imprisoned for both qualifying and non-qualifying offenses without determining whether the portion of the sentence attributable to the qualifying offense has been completely served?
(2) May the Crime Lab collect and maintain a DNA sample from an inmate who has been convicted of a qualifying offense in the past, but who is currently serving a sentence for a non-qualifying offense?
In our opinion, the relevant statute does not require that an inmate be currently serving a sentence for a qualifying offense in order to be eligible for DNA sampling, so long as the inmate has been convicted at some time of a qualifying offense.
 I Background
A. Statewide DNA Data Base
DNA stands for deoxyribonucleic acid, a substance that carries genetic information in human beings. Comparisons of DNA evidence with known samples can lead to the identification of individuals involved in crimes or other incidents. The results of such comparisons are therefore admissible in criminal cases and other proceedings under certain conditions. See 89 Opinions of theAttorney General 189 (2004).
State law directs the Crime Lab to maintain a statewide DNA data base and DNA repository. Annotated Code of Maryland, Public Safety Article ("PS"), § 2-502. The data base consists of identification characteristics of DNA samples stored in the statewide DNA repository. PS § 2-506. The repository consists largely of samples obtained from individuals who have been convicted of felonies or two other predicate offenses: burglary in the fourth degree (Annotated Code of Maryland, Criminal Law Article § 6-205) and breaking and entering a motor vehicle (Criminal Law Article § 62-06). The DNA data base law identifies the individuals to be sampled as follows:
 (1) . . . [A]n individual who is convicted of a felony or a violation of § 6-205 or § 6-206 of the Criminal Law Article shall:
 (i) have a DNA sample collected either at the time of sentence or on intake to a correctional facility, if the individual is sentenced to a term of imprisonment; or
 (ii) provide a DNA sample as a condition of sentence or probation, if the individual is not sentenced to a term of imprisonment.
 (2) An individual who was convicted of a felony or a violation of § 6-205 or § 6-206 of the Criminal Law Article on or before October 1, 2003 and who remains confined in a correctional facility on or after October 1, 1999, shall submit a DNA sample to the Department.
PS § 2-504(a). The Court of Appeals has held that the collection of DNA samples from incarcerated individuals is constitutional and does not violate the Fourth Amendment. State v. Raines,383 Md. 1, 857 A.2d 19 (2004).
Your two questions relate to DNA sampling of inmates. The answers to both questions turn on whether the statute limits the universe of inmates to be sampled to those serving a sentence for a qualifying offense at the time of sampling.[1]
 II Analysis
A. Statutory Language
The DNA data base law authorizes the DNA sampling of two categories of convicts: (1) those newly convicted of qualifying offenses and (2) inmates previously convicted of those offenses. The statute describes the second category to include an "individual who was convicted of [a qualifying offense] on or before October 1, 2003 and who remains confined in a correctional facility on or after October 1, 1999. . . ." PS § 2-504(a)(2) (emphasis added).
The meaning of the verb phrase "remains confined" is somewhat ambiguous, but is critical to the answer to your questions. First, it could be interpreted to mean that the inmate is still serving the sentence for the conviction referenced earlier in the same sentence — i.e., the offense that qualifies the inmate for DNA sampling. Under this interpretation, once the sentence for the qualifying offense is completely served, the inmate no longer qualifies for DNA testing, even if the inmate is still incarcerated as a result of other offenses. This interpretation would require a determination of the precise basis of the inmate's current confinement.
Second, the phrase could signify only that the inmate has been continuously incarcerated since the conviction for the qualifying offense, without implying any condition on the basis of the inmate's current confinement. Under this interpretation, one need only determine that the inmate was previously convicted of a qualifying offense and has not been released from custody in the interim.
Finally, the word "remains" may be used simply in the sense of "is present"[2] and is not meant to signify that the inmate has been in continuous confinement nor that the current confinement is based on the qualifying conviction. Under this interpretation, the prior conviction for a qualifying offense coupled with current confinement renders the inmate eligible for sampling. There would be no need to parse out what sentence or sentences the inmate is serving at the time of sampling or to investigate whether the individual had been out of State custody since the time of the qualifying conviction.
To select among these alternatives, we look to relevant court decisions and the legislative history of the DNA data base statute.
B. Court Decisions
To our knowledge, no Maryland reported decision directly addresses your questions. However, the circumstances of theRaines case lend some support to a reading of the statute that would make an inmate with a past qualifying conviction eligible for DNA sampling, regardless of the basis or continuity of the inmate's current confinement — the third alternative outlined above. As noted previously, in Raines, the Court of Appeals addressed the constitutionality of the DNA sampling authorized by the DNA data base statute. In setting out the facts of the case, the Court noted that Raines qualified for DNA sampling as a result of his 1982 robbery conviction and that, at the time of sampling in 1999, he was incarcerated for another offense unrelated to the 1982 robbery. Raines, 383 Md. at 5 n. 5. Thus, it appears that Raines was not necessarily incarcerated for a qualifying offense at the time of the DNA sampling — or at least that the Court believed that it made no difference in light of his 1982 qualifying conviction.[3] The Court did not specifically address the propriety of sampling an individual who was currently incarcerated for a non-qualifying offense, as Raines apparently had not raised that issue. Nevertheless, the Court appeared to accept the idea that the statute authorized such a sampling if the individual had been previously convicted of a qualifying offense.
Courts in two other states have reached differing conclusions on whether a state DNA sampling law applies to an inmate previously convicted of a qualifying offense but currently serving a sentence for a non-qualifying offense. These decisions are of limited utility in construing PS § 2-504(a) as they turn, to some extent, on the particular language of statutes that are not identical to the Maryland law.
In Smith v. Department of Corrections, 837 A.2d 652
(Pa. Comm. Ct. 2003), the relevant Pennsylvania statute provided that a person who had been convicted of a qualifying offense "and who serves a term of confinement in connection therewith on or after [the effective date of the statute] shall not be released in any manner unless and until a DNA sample has been withdrawn."837 A.2d at 654 (emphasis added).[4] Relying on the literal language of the statute, the court held that the statute did not authorize DNA sampling of an individual who had previously been convicted of a qualifying offense, but who was currently confined for a non-qualifying offense. Id.; see also Commonwealth v.Derk, 895 A.2d 622, 631-32 (Pa.Sup.Ct. 2006). The inclusion of the phrase "in connection therewith" in the Pennsylvania statute clearly makes a connection between the qualifying conviction and current confinement a condition of DNA sampling of inmates. No similar phrase appears in the Maryland statute.
In Murphy v. Department of Correction, 711 N.E.2d 149
(Mass.Sup. Jud. Ct. 1999), the Massachusetts Supreme Judicial Court construed a state statute that required DNA sampling of any individual convicted of a qualifying offense "who is incarcerated . . . on the effective date of this act, notwithstanding the date of such conviction. . . ." 711 N.E.2d at 151. An inmate who had previously been convicted of a qualifying offense, but who was currently serving a sentence for a non-qualifying offense, argued that the statute only applied to those inmates who were currently serving sentences for qualifying offenses. Id. The Supreme Judicial Court held that the statutory language "is clear; it requires any person ever convicted of a listed offense, who is incarcerated on the effective date of the statute, to provide a DNA sample." Id. at 152. The court observed that this construction not only suited the literal language of the statute, but also carried out the policy underlying the statute to identify or exclude individuals for criminal investigation and prosecution. "The Legislature has evidently determined that the statutory purpose is best served by collecting DNA samples from individuals convicted of [qualifying offenses]. It is entirely rational that, in pursuit of the statutory goal, the Legislature should provide for collection of DNA samples from as many of these individuals as possible." Id. The court reasoned that it was also rational for the Legislature not to require that samples be taken from those previously convicted of qualifying offenses who were not currently in confinement, given the burden of locating and sending officers to collect samples from those individuals. Id.
While PS § 2-504(a) is not identical to the Massachusetts statute, as noted above, it would be interpreted similarly if the phrase "remains incarcerated" in the Maryland statute was meant to convey the same meaning as "is incarcerated" (the third alternative outlined above) or "is confined" (the Massachusetts statute). A review of the legislative history of PS § 2-504(a) reveals that it was inspired by policy concerns similar to those articulated by the Massachusetts court.
C. Legislative History
The Maryland DNA data base law was first enacted in 1994. Chapter 458, Laws of Maryland 1994, then codified at
Article 88B, § 12A. It was the product of an Administration bill that was intended to create a State DNA data base similar to those established in at least 22 other states, which would allow the State to participate in a nationwide DNA data base network maintained by the Federal Bureau of Investigation.[5]
Testimony of Kevin Hughes, Governor's Legislative Office, and Col. Larry Tolliver, Superintendent of Maryland State Police before the Senate Judicial Proceedings Committee on House Bill 410 (1994). The purpose of the network was to assist law enforcement agencies throughout the nation in solving crimes involving repeat offenders, as well as to deter those offenders.
Although matching of evidentiary DNA samples was seen as an effective tool for law enforcement, the lack of a data base of DNA profiles for comparison was a stumbling block. "The bill [was] designed to solve this problem by creating a data base composed of samples obtained from persons convicted of sexual offenses." Floor Report for House Bill 410 (1994).
To efficiently populate the data base with DNA samples that would likely serve its law enforcement purposes, the statute necessarily had to define a population for sampling that could be reached in a cost-effective manner. The Administration targeted known sex offenders currently incarcerated or on parole as the initial source of samples for the data base. Testimony of Kevin Hughes, Governor's Legislative Office, and Col. Larry Tolliver,supra. It was estimated that 5,000 incarcerated or paroled sex offenders would be immediately eligible to be sampled under the proposed bill. Id. Other types of offenders were to be added in the future, but the original proposal was limited to sex offenders so as not to "overwhelm the system" as it was launched.Id. Under the bill as originally introduced, provision of a DNA sample by such an individual would be a condition of release from custody or supervision. House Bill 410, first reader (1994).
Thus, the proposed bill limited the initial sampling in two ways. First, it focused on convicted sex offenders — a category of offenders seen as prone to recidivism whose offenses often involved DNA evidence and who might be effectively deterred or detected by the creation of the data base. Second, it limited the population of sex offenders to be sampled to those on parole or in custody. In that way, the bill focused on a subset whose location was presumably already known to criminal justice authorities and over whom the State could exert some leverage in obtaining the required samples.
As noted above, the bill, as originally introduced, would have provided for DNA sampling of all individuals who had been convicted of certain sex offenses and were either in custody or on parole. Concerns apparently were raised about the logistics and expense of finding and obtaining samples from the offenders who were not in the State's physical custody. As a result, the Administration offered an amendment, adopted by the General Assembly, that removed parolees from the list of offenders required to submit to DNA sampling. Administration representatives stated that the amendment was "strictly a cost containment measure," reducing the anticipated cost of the program for the first year from $1.4 million to under $1 million for fiscal year 1995. Letter from Kevin Hughes, Assistant Legislative Officer, Office of the Governor, to the Honorable Joseph Vallario, Chairman, House Judiciary Committee (March 15, 1994). It is evident that, even with this amendment, the intent was to sample as many individuals who had been convicted of the qualifying offenses as possible within fiscal constraints. There is no indication in the legislative record that the General Assembly intended to make fine distinctions as to the basis for a particular offender's current incarceration.[6]
As ultimately enacted in 1994, the statute required anyone convicted of a "qualifying crime of violence" — at that time defined to include certain sexual offenses — to provide a DNA sample following sentencing. It further provided that an individual who had been convicted of such an offense prior to the effective date of the statute and "who remains incarcerated on that date" would also provide a DNA sample. Former Article 88B, § 12A(d). As predicted when the original bill was presented to the Legislature in 1994, the statute has subsequently been amended to expand the range of qualifying offenses for DNA sampling. See
Chapter 490, Laws of Maryland 1999 (adding murder, robbery, robbery with a deadly weapon, first degree assault, and certain attempted crimes to the list of qualifying offenses); Chapter 240, Laws of Maryland 2003 (revising statute to encompass current categories of qualifying offenses: all felonies and violations of Criminal Law Article § 6-205 and § 6-206). In 2003, it was recodified as part of the new Public Safety Article. Chapter 5, § 2, Laws of Maryland 2003.
D. Summary
It thus appears that the Legislature was focused on gathering DNA samples of the greatest interest to law enforcement authorities in the most cost-effective manner. As a result, the sampling program targeted offenders already in custody and those who would come under State supervision in the future. Other than excepting parolees from the sampling program for fiscal reasons, the General Assembly did not explicitly exclude from the program other categories of individuals with qualifying convictions who are in State custody. There are also practical impediments to an interpretation that would tie the inmate's current confinement to the qualifying conviction.
Many inmates are incarcerated for multiple offenses and may be serving concurrent sentences, partially concurrent sentences, consecutive sentences, or a combination of concurrent and consecutive sentences. See Annotated Code of Maryland, Correctional Services Article, § 3-701 (defining "term of confinement" for purposes of law governing diminution credits). If an inmate who had been convicted of a qualifying offense could be sampled only during the portion of his or her confinement that was attributable to the qualifying offense, those charged with carrying out the sampling mandate would face a likely insurmountable task of unraveling and disaggregating various sentences, perhaps assigning diminution credits to one or another. Cf. Secretary of Public Safety and CorrectionalServices v. Hutchinson, 359 Md. 320, 321-23, 753 A.2d 1024
(2000) (referring to the "arcane world of diminution credits" and the "intricate series of calculations" necessary to determine when inmate has completed sentence or becomes eligible for release); 84 Opinions of the Attorney General 50 (1999) (describing difficulty of computing good conduct credits for inmates serving multiple sentences). None of these adjustments and computations would change the two most critical facts that the inmate had been previously convicted of a qualifying offense and that the inmate was currently in State custody. The determination of whether an inmate was eligible to be sampled would become a highly complex endeavor, with little relation to the policy reasons underlying the statutory mandate for gathering DNA samples from inmates.
It is therefore unsurprising that, in Raines, neither the parties nor the Court of Appeals raised any question as to whether the inmate was eligible for sampling, even though his incarceration may have been unrelated to his qualifying conviction. In our view, if the Court of Appeals were squarely presented with the question, it would likely conclude that PS § 2-504(a) does not require that an inmate be currently incarcerated for a qualifying offense in order to be sampled.
 III Conclusion
In our opinion, PS § 2-504(a) does not require that an inmate be currently serving a sentence for a qualifying offense in order to be eligible for DNA sampling, so long as the inmate has been convicted at some time of a qualifying offense.
 J. Joseph Curran, Jr. Attorney General
 Sharon B. Benzil Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] Apparently, conflicting advice has been given informally in the past by attorneys advising the Department of Public Safety and Correctional Services and the Department of State Police as to whether the data base law authorized sampling of an individual who was currently serving a sentence for a non-qualifying offense, but who had been convicted of a qualifying offense in the past.
[2] See Roget's International Thesaurus (3d ed. 1962) at p. 1097.
[3] It is possible that, as a result of a parole violation based on his subsequent criminal activity, Raines might have also been serving a portion of the 1982 sentence at the time of his DNA sampling. However, the Court did not explore that issue.
[4] An earlier version of the statute was even clearer, providing for DNA sampling of an individual who had been convicted of a qualifying offense "and who is still serving a term of confinement in connection therewith . . ."837 A.2d at 653.
[5] The data base network is known as the Combined DNA Index System (CODIS). See 42 U.S.C. § 14135.
[6] A sentence in the Floor Report could be interpreted to express a narrower view of the population subject to sampling. It stated that "the data base will contain DNA samples only from persons who are convicted of certain sexual offenses or who are already serving terms of imprisonment for such offenses." Floor Report for House Bill 410 (1994) at p. 2 (emphasis added). This sentence could be read to mean that the only inmates to be sampled would be those currently serving terms for qualifying offenses. However, neither this sentence nor the rest of the Floor Report purported to exempt categories of individuals previously convicted of qualifying offenses from sampling. As noted above, the proponents of the data base law focused on inmates and other individuals under the supervision of the State as a method for quickly populating the data base in a cost-effective manner. *Page 145